

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| JEFFREY COX, ET AL., | ) | |
| | ) | |
| Appellants, | ) | WD87512 |
| | ) | |
| v. | ) | OPINION FILED: |
| | ) | |
| THE BANK OF NEW YORK MELLON, | ) | August 12, 2025 |
| | ) | |
| Respondent. | ) | |
| | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
**Honorable David P. Chamberlain, Judge**

**Before Division Three: Mark D. Pfeiffer, Presiding Judge,**
**Cynthia L. Martin, Judge, and Janet Sutton, Judge**

Jeffrey Cox (Mr. Cox), one of the named representatives of a class certified in 2003 (collectively, the Borrowers), appeals from an order and judgment entered by the Circuit Court of Clay County, Missouri (circuit court). The circuit court granted The Bank of New York Mellon's (BNYM) motion for summary judgment because there was no genuine dispute of material fact as to whether it could exercise specific jurisdiction over BNYM because (1) BNYM did not engage in any of the enumerated acts in Missouri's long-arm statute, section 506.500,[1] and, (2) the exercise of personal jurisdiction over BNYM would not comply with due process. We affirm, concluding that BNYM's role with respect to the Borrowers' loans, performed

---

[1] All statutory references are to the Revised Statutes of Missouri, unless otherwise noted.

entirely outside of Missouri, is insufficient to provide a Missouri court personal jurisdiction over BNYM in this action.

## Factual and Procedural Background[2]

This case—a class action lawsuit that has been pending before the circuit court for more than twenty years—has a complex history with an extensive record. It has been before seven judges in four divisions of the circuit at various times. For purposes of this appeal, we try to include only those facts necessary for a full understanding and evaluation of the propriety of summary judgment on the issue of whether the circuit court could exercise specific jurisdiction over BNYM.

The Borrowers obtained second mortgage loans[3] in 1997 and 1998 on their Missouri homes from Century Financial Group, Inc. (CFG), a California mortgage lender. CFG was solely responsible for originating and closing the loans. After CFG originated the Borrowers' mortgage loans, CFG sold the loans to other entities, including Master Financial, Inc. (MFI) and

---

[2] "When reviewing the entry of summary judgment, we view the record in the light most favorable to the party against whom the judgment was entered and accord the non-movant all reasonable inferences from the record." *Cox v. Callaway Cnty. Sheriff's Dep't*, 663 S.W.3d 842, 845 n.1 (Mo. App. W.D. 2023) (quoting *Show-Me Inst. v. Off. of Admin.*, 645 S.W.3d 602, 604 n.2 (Mo. App. W.D. 2022)). We have compiled the factual background from the properly supported uncontroverted facts contained in the summary judgment pleadings. *Id.*

[3] The Missouri Second Mortgage Loans Act (MSMLA) defines "second mortgage loan" as "a loan secured in whole or in part by a lien upon any interest in residential real estate created by a security instrument, including a mortgage, trust deed, or other similar instrument or document, which provides for interest to be calculated at the rate allowed by the provisions of section 408.232, which residential real estate is subject to one or more prior mortgage loans." § 408.231.1.

The Money Store, Inc. (TMS).[4]  MFI, acting alone, decided which mortgage loans to purchase.[5]

MFI then pooled the Borrowers' second mortgage loans with other similar mortgage loans from

all fifty states via mortgage securitization trusts.

The relevant securitization process occurred in three steps.  First, MFI sold the loans to a

Depositor.  Second, the Depositor sold the loans to one of three Delaware statutory trusts.  The

three mortgage securitization trusts were the Master Financial Asset Securitization Trust 1997-1

(the 1997-1 Trust), Master Financial Asset Securitization Trust 1998-1 (the 1998-1 Trust), and

Master Financial Asset Securitization Trust 1998-2 (the 1998-2 Trust).  (Collectively, the

Trusts.)  Third, the Trusts, as Issuer, issued bonds called "certificates" and "notes" in various

classes which investors could and did purchase.  The cash flows from the underlying mortgage

loans were used to repay those investors.  Of the thousands of loans that were securitized this

way, only a very small percentage—no more than 2.1%—were secured by real property in

Missouri.

After the loans were sold to and deposited into the Trusts, BNYM, a bank chartered

under the laws of New York and headquartered in New York, New York, was named Co-Owner

Trustee, and Indenture Trustee of the 1997-1 and 1998-1 Trusts, and Grantor Trustee and

---

[4]  In 2013, the trial court issued an order and judgment approving class action settlement and certifying the "TMS Settlement Class" for settlement purposes.  The TMS Settlement Class was defined as those persons who had obtained second mortgage loans on or after June 28, 1994, secured by a mortgage or deed of trust on Missouri residential property and originated by CFI and purchased or assigned to TMS.

[5]  As the circuit court correctly noted, the Borrowers attempted to deny this statement of material fact, but nothing in their response and cited evidence supported their denial.  "[I]f evidence is cited to support a denial, but that evidence does not expressly support a denial, we deem the statement admitted." *Fid. Real Est. Co. v. Norman*, 586 S.W.3d 873, 884-85 (Mo. App. W.D. 2019).  Accordingly, this fact is deemed admitted.  We find this to be the case with many of the Borrowers' other purported denials.  Additionally, the Borrowers also attempt to deny statements of material fact but the denials consist only of legal conclusions, which we disregard.

Indenture Trustee of the 1998-2 Trust.[6] BNYM's role regarding the Trusts began only after the loans were funded, closed, sold, and deposited into the Trusts by other parties.

BNYM does not have any officers, directors, employees, offices, or registered agent for service of process in Missouri. It does not have a post office box, telephone listing, or mailing address in Missouri. Further, BNYM does not sell any products or services in Missouri or loan money to Missouri consumers.

BNYM's roles in connection with the Trusts were spelled out in various documents that BNYM executed, including, trust agreements, indentures, and sale and servicing agreements.[7] (Collectively, the trust documents.) As Co-Owner Trustee, Grantor Trustee, and Indenture Trustee, BNYM established and maintained the trust accounts from which payments and distributions to the Trusts' bondholders were made.[8] As Indenture Trustee, BNYM served as the recordkeeper for the bonds issued by the Trusts, calculated payment amounts to the bondholders, and it ensured proper distribution of payments to the bondholders from the New York trust accounts. In connection with the Trusts, BNYM never took any of these actions in Missouri. BNYM never interacted with individual borrowers, like Mr. Cox, or other class members.

The sale and servicing agreements for all three trusts specifically provided that the relationship of MFI, as Servicer, to the Trusts and Indenture Trustee was "that of an independent

---

[6] BNYM's other titles were Administrator, Custodian, and Paying Agent of the Trusts. Wilmington Trust Company also served as Owner Trustee in connection with the 1997-1, 1998-1, and 1998-2 Trusts. In October 2020, the circuit court granted Wilmington Trust Company's motion for summary judgment for lack of personal liability.

[7] These documents included the 1997-1 Trust Agreement, 1997-1 Sale and Servicing Agreement, 1997-1 Indenture, 1998-1 Trust Agreement, 1998-1 Sale and Servicing Agreement, 1998-1 Indenture, 1998-2 Trust Agreement, 1998-2 Sale and Servicing Agreement, and 1998-2 Indenture.

[8] The Borrowers do not argue that the outcome on appeal would be different based on BNYM's different titles it possessed in relation to the Trusts.

contractor and not of a joint venturer, agent or partner[.]" As Servicer, MFI submitted monthly statements to borrowers, and borrowers made their monthly payments to MFI. Upon collecting borrower payments from its location in Orange, California, MFI transferred a portion of those monies from Orange, California, to the trust accounts maintained by BNYM in New York, for ultimate distribution to the Trusts' bondholders.

In October 2004, MFI elected to repurchase the underlying certificates and notes, and, in 2006, the Trusts were formally cancelled.

In June 2000, the original plaintiffs filed this action against CFG and MFI as well as Does 1-25. The plaintiffs alleged, among other things, that the defendants violated the fee limitations of the MSMLA by directly or indirectly charging, contracting for, and/or receiving excessive loan origination fees and other fees not permitted by section 408.233.1.

In 2001, the plaintiffs filed a first amended petition, adding, among other defendants, the Trusts. In 2002, the original plaintiffs moved for class certification, and in early 2003, the circuit court issued its order certifying the plaintiff class pursuant to Rule 52.08. The circuit court defined the class as "[a]ll individuals who, on or after June 28, 1994: obtained a 'Second Mortgage Loan' from Century Financial; and who paid [fees or interest in violation of the MSMLA], or who financed the payment of [fees or interest in violation of the MSMLA] as part of the principal loan balance, at or before closing . . . ." After the class certification, in February 2003, the Borrowers filed their third amended petition adding BNYM as a defendant and Mr. Cox as a plaintiff.

The operative petition, the fourth amended petition, was filed in 2004. The petition named over ninety defendants and alleged, *inter alia*, that the defendants directly violated the MSMLA, and continued to violate it by charging and/or receiving interest and principal on the

5

loans, which included portions of the illegal settlement charges that had been financed as part of the principal loan amounts. The Borrowers sought to recover all excessive loan origination and other fees they were charged in connection with the CFG loans and all interest paid or to be paid on the loans, prejudgment interest, punitive damages, reasonable attorneys' fees, and equitable relief. According to the petition, BNYM was subject to personal jurisdiction in Missouri under four theories: that it (1) transacted business in Missouri, (2) made contracts in Missouri; (3) committed tortious acts in Missouri; and (4) used Missouri real estate to secure the second mortgage loans.

In 2015, BNYM moved to dismiss the claims against it, arguing that (1) the circuit court lacked personal jurisdiction over it, and (2) the Borrowers' claims were barred by the three-year statute of limitations in section 516.130(2). The circuit court granted the motion to dismiss based on the statute of limitations defense, but it did not address BNYM's alternative ground for dismissal, *i.e.*, lack of personal jurisdiction. The Borrowers appealed, and this Court reversed in 2018, concluding that the Borrowers' claims were governed by a six-year statute of limitations in section 516.420. *Baker v. Century Fin. Grp., Inc.*, 554 S.W.3d 426, 439 (Mo. App. W.D. 2018). We remanded for the circuit court to rule on BNYM's motion to dismiss for lack of personal jurisdiction. *Id.* In 2019, after additional briefing on the issue, the circuit court denied BNYM's motion to dismiss in a docket entry with no additional explanation.

Discovery proceeded, and in 2023, BNYM moved for summary judgment, arguing that the circuit court lacked personal jurisdiction over BNYM. After the Borrowers responded, and BNYM filed its sur-reply, on August 14, 2024, after more than twenty years of litigation, the

6

circuit court granted BNYM's motion for summary judgment for lack of personal jurisdiction.[9] The circuit court concluded that there was no genuine dispute of material fact as to whether it could exercise specific jurisdiction over BNYM because (1) BNYM did not engage in any of the enumerated acts in Missouri's long-arm statute, and, (2) that the exercise of personal jurisdiction over BNYM would not comply with due process.

Specifically, the circuit court rejected the Borrowers' contention that MFI acted as BNYM's agent, stating that there was no genuine issue of material fact on any of the elements that would establish an agency relationship. The circuit court also rejected each of the Borrowers' theories of personal jurisdiction under the long-arm statute. The circuit court found that the undisputed facts showed as a matter of law that BNYM, in person or through an agent, did not own, use, or possess Missouri real estate, transact any business or make contracts in Missouri, or commit a tortious act in Missouri. The circuit court also concluded that even if the long-arm statute was satisfied, exercising personal jurisdiction over BNYM would violate its due process rights.

The Borrowers appeal. Additional facts will be provided below, as necessary.

**Finality of the Judgment**

This Court, acting *sua sponte* if necessary, must first determine whether we have jurisdiction to review an appeal. *Wilson v. City of St. Louis*, 600 S.W.3d 763, 765 (Mo. banc 2020); *Barnett v. Forster*, 687 S.W.3d 21, 24 (Mo. App. E.D. 2024); *West v. Sharp Bonding Agency, Inc.*, 327 S.W.3d 7, 10 n.5 (Mo. App. W.D. 2010). This Court has "jurisdiction to review a case upon the issuance of a 'final judgment' from a court below." *West*, 327 S.W.3d at

---

[9] BNYM had also filed a motion for partial summary judgment on the issue of liability. The circuit court denied this motion based on its conclusion that it lacked personal jurisdiction over BNYM.

7

10 n.5 (citing § 512.020(5); Rule 74.01). Generally, a final judgment disposes of all parties and all issues in a case, leaving nothing for future determination. *Id*. We must dismiss the appeal if the circuit court's judgment is not final. *Id*. "Rule 74.01(b) provides an exception to this general rule by permitting the trial court to designate as final a judgment 'as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay.'" *Id*. We must independently determine if the circuit court's judgment actually qualifies as final because the circuit "court's certification of a judgment as final is not conclusive[.]" *Id*. To do so, we look at the "judgment's content, substance, and effect." *Id*. "When the trial court resolves all issues and leaves open no remedies as to one of several defendants, the court may certify its judgment as final for purposes of appeal with regard to that defendant." *Id*. (citation omitted).

Here, the circuit court's August 14, 2024, grant of summary judgment to BNYM resolved all claims pending against BNYM. The circuit court, pursuant to Rule 74.01(b), expressly determined that there was no just reason for delay and certified the judgment as final for purposes of appeal. We conclude that the circuit court's summary judgment ruling as to BNYM constitutes a final judgment subject to appellate review by this Court.

**Standard of Review**

The grant of summary judgment is an issue of law that an appellate court reviews *de novo*. *Green v. Fotoohighiam*, 606 S.W.3d 113, 115 (Mo. banc 2020) (citation omitted); *Show-Me Inst. v. Off. of Admin.*, 645 S.W.3d 602, 607 (Mo. App. W.D. 2022). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law . . . ." Rule 74.04(c)(6).[10] "When reviewing the entry of

---

[10] Missouri Supreme Court Rules (2024).

summary judgment, we view the record in the light most favorable to the party against whom the judgment was entered and accord the non-movant all reasonable inferences from the record." *Show-Me Inst.*, 645 S.W.3d at 604 n.2. A defending party is entitled to summary judgment if it can show one of the following:

> (1) facts negating any one of the [plaintiff's] elements necessary for judgment; (2) that the [plaintiff], after an adequate period of discovery, has not been able to— and will not be able to—produce evidence sufficient to allow the trier of fact to find the existence of one of the [plaintiff's] elements; or (3) facts necessary to support [its] properly pleaded affirmative defense.

*Id*. at 607. Whether sufficient evidence has been presented to make a *prima facie* showing of personal jurisdiction over a defendant is a question of law that this Court reviews *de novo*. *Brovont v. KS-I Med. Servs., P.A.*, 622 S.W.3d 671, 685 (Mo. App. W.D. 2020).

## Legal Analysis

In the Borrowers sole point on appeal, they argue the circuit court erred in granting summary judgment in favor of BNYM because BNYM, in person or through an agent, engaged in conduct that fell under three different provisions of the long-arm statute when it directly or indirectly received illegal fees and interest in connection with the Borrowers' second mortgage loans.[11] In the same point, the Borrowers also argue that there were sufficient contacts to subject BNYM to the circuit court's specific jurisdiction without offending due process. In this point, the Borrowers include multiple different legal reasons as to why the circuit court erred in granting summary judgment. A point that contains multiple independent claims and that sets

---

[11] In the Borrowers' point they argue that there are material facts in dispute that precluded the entry of summary judgment in favor of BNYM. In the rest of their briefing, however, the Borrowers take the position that, despite the uncontroverted facts, the entry of summary judgment in favor of BNYM was improper as a matter of law. A point relied on that is not developed in the argument section or an argument that is not consistent with the point relied on is itself a basis for denial of the point.

9

forth multiple legal theories for reversal is multifarious and is noncompliant with Rule 84.04(d). *Bi-Nat'l Gateway Terminal, LLC v. City of St. Louis*, 697 S.W.3d 593, 598 (Mo. App. E.D. 2024). *See also Eivins v. Mo. Dep't of Corr.*, 695 S.W.3d 212, 219-20 n.8 (Mo. App. W.D. 2024). A multifarious point is subject to dismissal. *Eivins*, 695 S.W.3d at 219-20 n.8. We have the discretion to review a multifarious point, especially when we can readily discern and separate the independent claims of error in the point. *Id.* We can do so in this case and therefore, choose to exercise this discretion with respect to the Borrowers' point on appeal.

Personal jurisdiction refers to the court's power over the parties in a case. *State ex rel. LG Chem, Ltd. v. McLaughlin*, 599 S.W.3d 899, 902 (Mo. banc 2020); *Copeland v. WRBM, LLC*, 679 S.W.3d 30, 37 (Mo. App. E.D. 2023). "Personal jurisdiction limitations arise from the defendant's right to due process of law. Limitations on courts' personal jurisdiction are enforced principally [to] protect the liberty of the nonresident defendant. For this reason, the convenience of plaintiffs or third parties does not factor into the analysis." *LG Chem*, 599 S.W.3d at 902 (internal quotation marks and citations omitted).

"Personal jurisdiction comes in two forms: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Copeland*, 679 S.W.3d at 37; *State ex rel. DKM Enters., LLC v. Lett*, 675 S.W.3d 687, 694 (Mo. App. W.D. 2023). *See also LG Chem*, 599 S.W.3d at 902. The plaintiff has the burden of establishing that a defendant's contacts with the forum state are sufficient when personal jurisdiction is contested. *Bryant v. Smith Interior Design Grp., Inc.,* 310 S.W.3d 227, 231 (Mo. banc 2010); *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 687 (Mo. App. E.D. 2020).

In this case, the parties agree that the circuit court does not have general jurisdiction over BNYM. The question, therefore, is whether the circuit court has specific jurisdiction over

10

BNYM pursuant to the long-arm statute. To assess personal jurisdiction over nonresident

defendants, Missouri courts use a two-prong test. *Andra v. Left Gate Prop. Holding, Inc.*, 453

S.W.3d 216, 225 (Mo. banc 2015); *Noble v. Shawnee Gun Shop, Inc.*, 316 S.W.3d 364, 370 (Mo.

App. W.D. 2010). "First, the defendant's conduct must fall within Missouri's long-arm statute,

section 506.500." *Andra*, 453 S.W.3d at 225. "Second, the defendant must have sufficient

minimum contacts with Missouri to satisfy due process." *Id.*

Pursuant to this analysis, we first consider whether there is a genuine dispute of material

fact as to whether BNYM's conduct fell within the long-arm statute. Missouri's long-arm statute

provides, in relevant part, that:

> 1. Any person or firm, whether or not a citizen or resident of this state, or any
> corporation, who in person or through an agent does any of the acts enumerated in
> this section, thereby submits such person, firm, or corporation, and, if an
> individual, his personal representative, to the jurisdiction of the courts of this state
> as to any cause of action arising from the doing of any of such acts:
>
> > (1) The transaction of any business within this state;
> >
> > (2) The making of any contract within this state;
> >
> > (3) The commission of a tortious act within this state;
> >
> > (4) The ownership, use, or possession of any real estate situated in this
> > state[.]

§ 506.500. The Borrowers contend that BNYM—in person and through its purported agent,

MFI—transacted business, committed a tort, and used or possessed real estate, all in Missouri.

We first address whether BNYM, acting alone, committed any of the enumerated acts in

section 506.500 subjecting it to long-arm jurisdiction. If not, we then must determine whether,

through an agent, BNYM committed any of the enumerated acts in the long-arm statute.

11

**BNYM Did Not Transact Business or Use or Possess Missouri Real Estate**

On appeal, the Borrowers contend that BNYM transacted business in Missouri and used or possessed Missouri real estate (1) through its acquisition of all right, title and interest in and to Borrowers' loans by purchase or assignment; (2) through the receipt and use of the Borrowers' mortgage loan payments, and (3) by physically possessing the loan documents. Put more simply, the Borrowers contend that BNYM transacted business in Missouri and used or possessed Missouri real estate because BNYM owned the Borrowers' loans deposited in the Trusts. Although transaction of business and use or possession of Missouri real estate are separate enumerated activities under the long-arm statute, we address these contentions together as the Borrowers utilize many of the same facts to support their argument.

We conclude that the undisputed material facts establish that BNYM was not an assignee of the Borrowers' loans, nor did it hold or take title to the Borrowers' loans.[12] In their attempt to impose ownership of the loans onto BNYM, the Borrowers ignore the governing trust documents and the applicable law under which the Trusts were established.

---

[12] We note that BNYM asks us to apply the doctrine of judicial estoppel to bar the Borrowers' argument that BNYM owned the loans because it is inconsistent with a position the Borrowers took previously in this case. BNYM contends that in an earlier stage of this litigation, in response to one of the Trusts' motion to dismiss for lack of personal jurisdiction, the Borrowers maintained that the loans were owned by the Trusts themselves, and not by the Trustee, BNYM. BNYM maintains that the Borrowers persuaded the circuit court to accept its position as it subsequently denied the motion to dismiss.

"Judicial estoppel may be appropriate when a party has taken truly inconsistent positions in separate proceedings." *Johnson v. City of Kansas City*, 695 S.W.3d 165, 172 (Mo. App. W.D. 2024). We decline to apply judicial estoppel in this case and under the circumstances. The inconsistent positions occurred within the same case and the Borrowers took the earlier position before discovery was completed.

***Provisions in the Trust Documents***

In their brief, the Borrowers contend there are a "plethora" of facts establishing that BNYM purchased or was assigned all right, title, and interest in and to the loans, the cash flows generated from the Borrowers' monthly payments, and that BNYM had physical possession of the loan documents. We conclude that the trust documents, on their face, show that BNYM did not acquire title to the loans through purchase or assignment.

Instead, the trust agreements confirm that the Trusts themselves held title to the loans. As the sale and servicing agreements expressly provided, in a section titled "Conveyance of the Initial Home Loans," the Depositor "s[old], transfer[red], assign[ed], set over and otherwise convey[d] *to the* [*Trusts*], without recourse but subject to the other terms and provisions of this Agreement, all of the right, title, and interest of the Depositor in and to the Trust Estate." (emphasis added). Further, in a different section, "Title to Trust Property," the sale and servicing agreements stated:

> Subject to the Indenture, *legal title to the Owner Trust Estate shall be vested at all times in the Trust as a separate legal entity* except where applicable law in any jurisdiction requires title to any party of the Owner Trust Estate to be vested in a trustee or trustees, in which case title shall be deemed to be vested in the Owner Trustee, the Co-Owner Trustee, and/or a separate trustee, as the case may be.

(emphasis added).

The "Owner Trust Estate" included the loans purchased by the Trusts, all payments and proceeds received on or with respect to the loans purchased by the Trusts, and the security instruments (*i.e.*, the mortgages or deeds of trust) securing the loans purchased by the Trusts. In other words, the Trusts themselves held title to the loans, the proceeds from the loans, and the security instruments—not BNYM which served as trustee.

The Borrowers direct us to various provisions from the trust documents they claim support their position. We have reviewed the various provisions cited by the Borrowers in the

13

trust documents and we conclude that the provisions do not establish that BNYM was a purchaser or assignee of the Borrowers' loans, but rather, that the trusts themselves held title to the loans. The Borrowers rely on granting clauses in the indentures and assignment of mortgage clauses in the sale and servicing agreements as evidence that the depositor sold and assigned all of its right, title, and interest in and to the Borrowers' loans to BNYM as Grantor Trustee. These provisions, however, do not establish that BNYM took title to the loans or that it was an assignee of the deeds of trust.

The indentures between the Trusts and BNYM, in a section titled "Granting Clause" stated, in relevant part that:

> Subject to the terms of this Indenture, the Issuer [The Trust] hereby Grants to the Indenture Trustee [BNYM] . . . as Indenture Trustee for the benefit of the holders of the Notes, all of the Issuer's right, title and interest in and to: (i) the Trust Estate (as defined in the Sale and Servicing Agreement); (ii) the Sale and Servicing Agreement (including the Issuer's right to cause the Transferor to repurchase Home Loans under certain circumstances described therein)[.]
>
> . . .
>
> The foregoing Grant is made in trust to secure the payment of principal of and interest on, and any other amounts owing in respect of, the Notes, equally and ratably without prejudice, priority or distinction, and to secure compliance with the provisions of this Indenture, all as provided in this Indenture.

This clause established that, in order to secure payment of the certificates and notes issued by the Trusts, and for the benefit of the investors, the Trusts granted BNYM, solely as Indenture Trustee, a security interest—not title—in the owner trust estate. The certificate and noteholders as secured creditors of the Trusts were protected by this arrangement, but it gave BNYM no rights of its own to deal with the trust assets as if they were BNYM's personal assets.

Next, the sale and servicing agreements between the Trusts and BNYM defined "Assignment of Mortgage" as:

14

[w]ith respect to each Home Loan, an assignment, notice of transfer or equivalent instrument sufficient under the laws of the jurisdiction where the related Mortgaged Property is located to reflect or record the assignment of the Mortgage with respect to such Home Loan to the Indenture Trustee for the benefit of the Securityholders.

The assignment of mortgage definition does not establish that BNYM was an "assignee" of the Borrowers' loans. Under this definition, BNYM itself was not assigned anything. Rather, BNYM was to be named in an assignment (if any), *as trustee* "for the benefit of the Securityholders"—*i.e.*, the Trusts' investors.

Finally, the Borrowers cite a section from the sale and servicing agreements providing that BNYM took custody of the original instruments and assignments for each home loan including "[t]he original Debt Instrument, [Note] endorsed 'Pay to the order of The Bank of New York, as Indenture Trustee for the Master Financial [Trust] without recourse.'" We fail to see how this section overcomes the clear provisions showing that the Trusts themselves owned the Trust property. The Borrowers also highlight a provision relating to the physical custody of the home loan files. This provision concerned maintenance of the files, not who held title to the loans, and further provided that the home loan files would be maintained at an office located in California.

The sections highlighted by the Borrowers do not overcome the clear provisions in the trust documents establishing that the Trusts themselves owned the Trust property, including the Borrowers' loans, instead of BNYM.

Our conclusion is further supported by the Trusts' organization itself. The Trusts were not ordinary common-law trusts, but instead, Delaware statutory trusts created pursuant to the predecessor to the Delaware Statutory Trust Act, 12 Del. Code, §§ 3801 *et seq.* (the DSTA). The trust agreements specifically provided that the agreements would be construed in accordance with Delaware law. Under the DSTA, a statutory trust has the capacity to sue and be sued and its

15

property is subject to execution and attachment as if it were a corporation. 12 Del. Code §3804(a). Additionally, under Delaware law, statutory trusts can own title to trust assets. *See* 12 Del. Code § 3801(i) ("A statutory trust may be organized to carry on any lawful business . . . including, without limitation, for the purpose of holding or otherwise taking title to property[.]"). Delaware law also provides that, except to the extent otherwise provided in the governing instrument of the statutory trust, even when "legal title to the property of the statutory trust" is "held in the name of any trustee of the statutory trust, in its capacity as such," it is treated under Delaware law "with the same effect as if such property were *held in the name of the statutory trust*." 12 Del. Code § 3805(f) (emphasis added). The Trusts' organization established that title to the trust estate, including the title to the Borrowers' loans, was vested at all times in the Trusts themselves.

Next, the Borrowers argue that BNYM's status as a trustee is sufficient for us to conclude that BNYM owned the Borrowers' loans, and therefore used or possessed Missouri real estate for purposes of the long-arm statute. To support their argument that a trustee is the legal owner of the trust property, the Borrowers rely on cases that uniformly concern Missouri common-law trusts—not statutory trusts. These cases state that in Missouri, title to property held in a *common law trust* vests in a trustee because common law trusts are not separate entities capable of holding title to property or of suing or being sued.[13] The trusts here though were not common

---

[13] *See McBee v. Gustaaf Vandecnocke Revocable Trust,* 986 S.W.2d 170, 172 (Mo. banc 1999) (internal citation omitted) (stating "[t]he trustee is . . . the legal owner of the trust property . . . and is a proper party against whom the suit may be filed and judgment affecting title to trust property may be entered"); *U.S. Bank, N.A. v. Smith*, 470 S.W.3d 17, 24 n.4 (Mo. App. W.D. 2015) (citation and internal quotation marks omitted) (examining a common law trust and explaining that because a trust is not a legal entity capable of suing or being sued that "[t]he trustee is the legal owner of the trust property, in which the beneficiaries have equitable ownership"). Our opinion should in no way be interpreted to disagree or conflict with such cases.

16

law trusts, but were Delaware statutory trusts, so these cases do not have any particular relevance to the issue in front of us, which is whether these specific Delaware statutory trusts held title to the trust assets.

Finally, the Borrowers maintain that the circuit court's pretrial choice of law ruling mandates that Missouri law applies to the issue of whether BNYM acquired all right, title, and interest in and to the Borrowers' loans by purchase or assignment. We disagree. BNYM had filed a motion for a choice of law determination seeking a ruling from the circuit court regarding the law to be applied to the issue of its liability to the Borrowers under the MSMLA. The circuit court concluded that Missouri law would apply to decide the issue of BNYM's liability on the Borrowers' claims.

The circuit court's choice of law determination was limited to BNYM's liability on the Borrowers' MSMLA claims. It was not binding or determinative of whether the circuit court had personal jurisdiction over BNYM. Our conclusion is consistent with cases examining contractual choice of law provisions and the relationship to personal jurisdiction over a defendant. *See Hoeman Cap. Mgmt. v. Robinson*, No. ED112375, slip op. at 5 (Mo. App. E.D. June 10, 2025) (stating that "a choice of law provision, on its own, is not sufficient to convey personal jurisdiction over a defendant"); *Hope's Windows, Inc. v. McClain*, 394 S.W.3d 478, 483 (Mo. App. W.D. 2013) (quotation marks and citation omitted) (explaining that a choice-of-law provision is not, on its own, sufficient to convey personal jurisdiction over a defendant).

The undisputed material facts demonstrate that BNYM performed all of its trustee responsibilities outside of Missouri and that it did not purchase the loans, nor was it assigned title to the loans. The Borrowers have not set forth any disputed material facts to establish that

17

BNYM transacted business in Missouri or used or possessed Missouri real estate that would subject it to specific jurisdiction under the long-arm statute.[14]

### BNYM Did Not Commit Any Tortious Acts in Missouri

Next, the Borrowers argue that BNYM committed tortious acts in Missouri by its indirect billing and direct and indirect receipt of unlawful charges in violation of the MSMLA. The Borrowers contend that BNYM's indirect monthly act of billing, collecting, and receiving unlawful fees and interest from the Borrowers, produced "tortious consequences" in Missouri and directly violated the MSMLA.[15]

First, the undisputed material facts show that CFG was solely responsible for originating and closing the loans, and MFI, acting alone, decided which mortgage loans to purchase. BNYM's role regarding the Trusts began only after the loans were funded, closed, sold, and deposited into the Trusts by other parties. As Co-Owner Trustee and Indenture Trustee, BNYM

---

[14] *See, e.g.*, *Pilcher v. Direct Equity Lending,* F.Supp.2d 1198 (D. Kan. 2002) (holding that specific jurisdiction could not be exercised over trusts that had no employees in Kansas, and had acquired, but did not make the challenged loans and did not control or direct the servicer in its operations).

[15] The phrase "tortious consequences" does not appear in section 506.500. The statute refers only to "the commission of a tortious act within this state." § 506.500(1)(3). "In order to rely upon the 'tortious act' provision of the long-arm statute, the [plaintiff is] required to show that the [d]efendants committed a tort in Missouri and that the action caused the [p]laintiffs' injuries." *Hollinger v. Sifers*, 122 S.W.3d 112, 116 (Mo. App. W.D. 2003). "The defendant must have set in motion some course of action which was deliberately designed to move into Missouri and injure the plaintiff." *Capitol Indem. Corp. v. Citizens Nat'l Bank of Fort Scott, N.A.*, 8 S.W.3d 893, 903 (Mo. App. W.D. 2000); *Montgomery v. Hopper*, 687 S.W.3d 426, 435 (Mo. App. S.D. 2024).

The *Calder* "effects" test provides that "a defendant's tortious acts can serve as a source of personal jurisdiction only where the plaintiff makes a *prima facie* showing that the defendant's acts (1) were intentional, (2) were uniquely or expressly aimed at the forum state, and (3) caused harm, the brunt of which was suffered—and which the defendant knew was likely to be suffered—[in the forum state]." *Johnson v. Arden*, 614 F.3d 785, 796 (8th Cir. 2010). *See Calder v. Jones*, 465 U.S. 783, 789-90 (1984).

18

established and maintained the trust accounts from which payments to the Trusts' bondholders were made and for making distributions from those accounts to the bondholders. As Indenture Trustee for the Trusts, BNYM served as the recordkeeper for the bonds issued by the Trusts, calculated payment amounts to the bondholders, and ensured proper distribution of payments to the bondholders from the New York trust accounts. BNYM did not take any of these actions in Missouri, it had no officers, directors, employees, or offices in Missouri, it did not sell any products or services in Missouri, and it did not loan money to Missouri consumers.

BNYM did not interact with individual borrowers, like Mr. Cox and other class members, and did not receive payments from any borrowers, including those in Missouri. Instead, as Servicer, MFI submitted monthly statements to the Borrowers, and the Borrowers made their monthly payments to MFI in California. Upon collecting borrower payments from its location in California, MFI then deducted its applicable fees before depositing the rest in the trust accounts maintained by BNYM in New York, for ultimate distribution to the Trusts' bondholders.

BNYM did not charge, receive, or collect anything from the Borrowers, including any purported illegal fees that violated the MSMLA. The undisputed material facts demonstrate that BNYM did not commit any tortious acts in Missouri subjecting it to long-arm jurisdiction.

### MFI Did Not Act As BNYM's Agent

Having decided that BNYM did not, acting alone, commit any of the enumerated acts under the long-arm statute, we now turn to the Borrowers' argument that MFI acted as BNYM's agent, and that MFI's conduct fell within the long-arm statute and its actions can therefore be imputed to BNYM to confer personal jurisdiction. If MFI was not acting as BNYM's agent, then MFI's actions related to the Borrowers' loans cannot be attributed to BNYM in order to establish

19

personal jurisdiction. *See State ex rel. DKM Enters., LLC v. Lett*, 675 S.W.3d 687, 700 (Mo. App. W.D. 2023).

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *State ex rel. Ford Motor Co. v. Bacon*, 63 S.W.3d 641, 642 (Mo. banc 2002) (quoting Restatement (Second) of Agency §1 (1958); *State ex rel. Elson v. Koehr,* 856 S.W.2d 57, 60 (Mo. banc 1993)). More simply, "an agency relationship exists when one person is authorized to represent and act for another in dealings with third parties." *Blanks v. Fluor Corp*, 450 S.W.3d 308, 378 (Mo. App. E.D. 2014) (quoting 2A C.J.S., Agency §1). "Because the fundamentals of agency law include the concept that the agent is a substitute for the principal, it is, accordingly, a consequence of the agency relationship that whatever an agent does in the lawful prosecution of the transaction entrusted to him is the act of the principal." *Id.*

"To establish agency, evidence must support a finding that the principal has consented to the agents acting on the principal's behalf, and the agent must be subject to the principal's control." *Ingham*, 608 S.W.3d at 697 (citation omitted). Agency, however, is not established by dominion and control alone. *Id.* The "essential elements" of an agency relationship are:

> 1) that an agent holds a power to alter legal relations between the principal and a third party;
> 2) that an agent is a fiduciary with respect to matters within the scope of the agency; [and]
> 3) that a principal has the right to control the conduct of the agent with respect to matters entrusted to the agent. . . .

*Id.* A purported agency relationship is defeated by the absence of any one of these elements. *Bacon*, 63 S.W.3d at 642.

We must determine whether there is a genuine issue of material fact as to whether an agency relationship exists between BNYM and MFI. We conclude that the Borrowers'

20

contention of an agency relationship between MFI and BNYM is defeated because of the absence of the third element alone, that the principal has the right to control the conduct of the agent with respect to matters entrusted to the agent.

The Borrowers argue that the trust agreements themselves provide evidence that BNYM exerted control over MFI, because (1) MFI was restricted in its actions to "accepted industry practices" and that (2) MFI could not keep the mortgage payments they collected, but instead, remitted the payments to BNYM for the Trusts. These contractual obligations do not establish that MFI acted under BNYM's direction or control, or that BNYM had the right to control the manner in which MFI performed its duties as servicer.

The uncontroverted evidence established that MFI acted independently and that BNYM did not have the ability to control or direct MFI in its operations. Specifically, the sale and servicing agreements designated MFI as an "independent contractor" and that it "shall service and administer the Home Loans and *shall have full power and authority, acting alone*, to do any and all things in connection with such servicing and administration which the Servicer may deem necessary and desirable and consistent with the terms of this Agreement." (emphasis added). The agreements also specified that:

> [T]he Servicer may waive, modify or vary any provision of any Home Loan or consent to the postponement of strict compliance with any such provision or in any manner grant indulgence to any Obligor if in the Servicer's reasonable determination such waiver, modification, postponement or indulgence is not materially adverse to the interests of the Securityholders . . .

> The Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of each Home Loan and the related Debt Instrument and Mortgage. Consistent with the foregoing, the Servicer may in its discretion waive or permit to be waived any late payment charge, prepayment charge or assumption fee or any other fee or charge. . . .

> . . .

21

In the event that any payment due under any Home Loan . . . is not paid when the same becomes due and payable . . . the Servicer shall, in accordance with the standard of care specified in Section 4.01(a) take such action as it shall deem to be in the best interest of the Securityholders to collect or liquidate such Home Loan in default in a manner that in the reasonable judgment of the Servicer will be likely to maximize the net proceeds realizable therefrom under the circumstances. . . .

Next, as purported evidence of control giving rise to an agency relationship, the Borrowers cite a section of the sale and servicing agreements titled "Default," that gave BNYM the power to terminate MFI and appoint a successor servicer if MFI failed to "duly . . . observe or perform, in any material respect, [its] obligations." BNYM contends that these provisions are not evidence of control, but instead only relay the basic contract principle that if there is a material breach to a contract, the aggrieved party may cancel the contract. We agree. These provisions are not evidence that BNYM had the ability to control that would be sufficient to form an agency relationship between MFI and BNYM.

Further, the undisputed testimony of BNYM's corporate designee established that BNYM did not have the ability to control MFI's actions. Specifically, BNYM's corporate designee testified:

Q. [D]o you agree with this statement, the Bank of New York had to ensure that the assets of the securitizations that we're talking about, Master Financial, the pool of loans, were properly serviced?

A. No.

Q. Did Bank of New York have to ensure that payments were being properly allocated to principal and interest by the servicer?

A. No.

Q. Did Bank of New York need to monitor the loan data to make sure that delinquencies were being identified and resolved?

A. No.

. . .

22

Q. [D]id the Bank of New York, in connection with these securitizations, have the ability to monitor the loans and the servicer, which in this case was Master Financial?

A. I'm not aware of any duty for the indenture trustee to monitor the servicer.

The governing trust agreements established that MFI had the full power and authority, acting alone, to do any and all things in connection with servicing the Borrowers' loans. The Borrowers failed to raise a genuine dispute of material fact regarding the element of control, and, therefore, we will not impute MFI's activities to BNYM on an agency theory to establish personal jurisdiction.

**We Need Not Reach the Minimum Contacts and Due Process Inquiry**

Finally, in their point relied on, the Borrowers contend that BNYM had sufficient contacts with Missouri to subject it to the circuit court's specific jurisdiction without offending due process. We need not reach this though as we have already determined there is no genuine issue as to the material facts that BNYM, neither individually or through an agent, engaged in at least one of the acts enumerated in the long-arm statute subjecting it to personal jurisdiction in Missouri. This is dispositive, and we need not address the second due process element of the jurisdictional analysis. *See LG Chem*, 599 S.W.3d at 903 n.2 ("Failure to make either showing is grounds to dismiss for lack of personal jurisdiction."); *Copeland*, 679 S.W.3d at 38 (holding that a plaintiff failed to plead facts necessary to satisfy the long-arm statute, that this was dispositive, and the Court need not address the second due process element of the jurisdictional analysis); *Lindley v. Midwest Pulmonary Consultants, P.C.*, 55 S.W.3d 906, 914 **(**Mo. App. W.D. 2001) (declining to address the issue of whether a defendant maintained sufficient minimum contacts with Missouri to satisfy due process when the plaintiff failed to make a *prima facie* case demonstrating that the suit arose from any of the activities enumerated in the long-arm statute).

23

The Borrowers' sole point on appeal is denied.

## Conclusion

The trial court's judgment is affirmed.

Janet Sutton, Judge

Mark D. Pfeiffer, P.J., and Cynthia L. Martin, J. concur.